IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARGARET BOBB, *et al.*                          *

    **Plaintiffs,**                          *

    v.                                      *                    Civ. No.  JKB-23-03129

**FINEPOINTS PRIVATE DUTY**                      *
**HEALTHCARE, LLC,** *et al.,*

    **Defendants.**                         *

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM

Plaintiffs brought this wage-and-hour action against Defendants FinePoints Private Duty Healthcare, LLC ("FinePoints"), and its owner, Cynthia Keller-Bee. The latter Defendant has since filed for bankruptcy, and thus Plaintiffs' claims against her are stayed. (*See* ECF No. 109.) Meanwhile, the Clerk has entered an order of default against FinePoints, and the date for FinePoints to move to vacate that default has passed. (*See* ECF No. 111.)

Now pending before the Court is Plaintiffs' Motion for Default Judgment and for Attorneys' Fees against FinePoints. (ECF No. 112.) The Motion will be granted.

## I.  Background

Plaintiffs sued in November 2023, bringing claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19 (Count I); the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401 to 3-431 (Count II); and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 to 3-509 (Count III). (ECF No. 1.) The operative Amended Complaint (ECF No. 74-3) is substantially similar to the original.

In March 2024, the Court conditionally certified a collective action under the FLSA, permitting "[a]ny individual who works or worked as a Home Care Aide (also known as a Personal

Care Aide or Certified Nursing Assistant) for Defendants from February 7, 2021, through the date

of the close of the Opt-in Period" to join as a plaintiff. (ECF No. 25.) Fifteen individuals (not

including the original Plaintiff) joined this lawsuit by the close of the Opt-In Period in October

2024.[1] (*See* ECF Nos. 28–31, 33–36, 38, 39, 41, 43, 47, 61, 65 (Notices of Consent to Opt In).)

Initially, both FinePoints and Keller-Bee actively participated in this lawsuit and were

represented by the same attorney, Samuel Sperling. But in December 2024, Ms. Keller-Bee filed

for bankruptcy. *See In Re Cynthia Keller-Bee*, Case No. 24-20440 (Bankr. D. Md. Dec. 11, 2024).

Consequently, Plaintiffs' claims against Ms. Keller-Bee in this case have been automatically

stayed, in accordance with 11 U.S.C § 362(a)(1). (*See* ECF No. 91.) Furthermore, in March 2025,

the Court granted Mr. Sperling's request to withdraw as counsel as to both Mr. Keller-Bee and

FinePoints. (ECF No 104.)

Because FinePoints failed to retain new counsel within thirty days of Mr. Sperling's

withdrawal, Plaintiffs filed a request for Clerk's entry of default against FinePoints (ECF No. 105),

and, on April 30, 2025, the Clerk of Court entered an order of default against FinePoints. (ECF

No. 106.) FinePoints did not move to vacate that default within the thirty-day deadline. On May

7, 2025, Ms. Keller-Bee docketed a letter with the Court. The Court stated, by order dated May

12, that it was "unable to fully discern the meaning of the letter," but that it "understands Ms.

Keller-Bee to be advising the Court that [FinePoints] has dissolved and is no longer able to afford

counsel." (ECF No. 109 at 1.) The Court also "advise[d] Ms. Keller-Bee that a business entity

such as a corporation or an LLC can only be represented by an attorney," and that Ms. Keller-Bee

could proceed *pro se* with respect to the claims against her as an individual but that she "cannot

speak for or represent FinePoints in this litigation." (*Id.* (first citing Local Rule 101.1(a) (D. Md.

---

[1] The Court understands these opt-ins to function as constructive amendments to the Amended Complaint.

2025), and then citing *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 106 (4th Cir. 2022).)

A few weeks later, on May 23, 2025, Plaintiffs filed a status report stating that FinePoints had "stopped participating in this litigation" as of March 28, 2025, and announcing that Plaintiffs intended to move for default judgment if FinePoints did not move to vacate the default by May 30, 2025. (ECF No. 110.)

On June 4, 2025, the Court ordered Plaintiffs to promptly file a motion for default judgment, or show cause why the same would not be appropriate. (ECF No. 111.) The Court specifically directed Plaintiffs to "address the question of whether the existence of outstanding claims in this action against [Ms. Keller-Bee] affects the propriety of granting default judgment at this time." (*Id.* at 1.)

The instant Motion for Default Judgment and Attorneys' Fees (ECF No. 112) followed. FinePoints has not responded, and the deadline for it to do so has passed.

## II.    Factual Allegations

Plaintiffs "all work or worked as home care aides (also known as personal care aides) for Defendants." (ECF No. 74-3 ¶ 1.) FinePoints "provides home care services to individuals in various locations throughout Maryland" and has over $500,000 in annual revenue. (*Id.* ¶¶ 6, 8.) Its clients are typically seniors and individuals with disabilities or illnesses that make it challenging for them to fully care for themselves on their own. (*Id.* ¶ 22.)

Ms. Keller-Bee, FinePoints' owner and operator, "controlled its daily operations, including setting policies concerning workers' pay rates and methods, controlling employees' work schedules, maintaining employees' work records and both maintaining and exercising her power to hire and fire employees." (*Id.* ¶ 10.)

3

A. *Plaintiffs' Work Environment and Responsibilities*

Plaintiffs' job responsibilities were as follows:

25. Defendants devised detailed individual-client treatment plans controlling the manner that Plaintiffs and other home care aides were to perform tasks associated with personal care.

26. Defendants' treatment plans directed Plaintiffs and other home care aides to monitor Defendants' clients' mental and physical condition, monitor their food and fluid intake and assist clients with meal preparation.

27. Defendants required Plaintiffs and other home care aides to assist clients with personal care, including bathing, dressing, grooming and performing similar hygiene-related tasks.

28. Defendants required Plaintiffs and other home care aides to assist clients with basic housekeeping and general cleaning, including washing dishes, sweeping floors, doing laundry and changing linens.

29. Defendants' treatment plans directed Plaintiffs and other home care aides to run errands with Defendants' clients. This primarily consisted of shopping for food and other household items.

30. Defendants required Plaintiffs and similarly situated home care aides to transport and accompany Defendants' clients to medical appointments.

31. Plaintiffs and other home care aides were also tasked with engaging clients in stimulating activities through conversations and social activities; Defendants directed Plaintiffs to develop continuing relationships with the clients they were assigned.

32. To perform their daily tasks, Plaintiffs and other home care aides were not required to have advanced knowledge or business-like initiative.

33. Plaintiffs and others similarly situated did not provide medical advice or diagnoses.

(ECF No. 74-3 ¶¶ 25–33.)

Defendants exercised control over Plaintiffs' work through various agreements and policies including an "Employee Policies and Procedures" agreement, a "Field Employee Standards and Procedures" agreement, and a "Confidentiality and Non-Competition" agreement. These

4

agreements required, *inter alia,* that Plaintiffs: (1) "take and upload pictures of themselves at clients' homes to confirm their arrival at each client's house"; (2) wear a FinePoints uniform and FinePoints identification badge while in clients' homes; (3) notify FinePoints if they were five or more minutes late to a shift, but *not* to notify clients directly; (4) seek approval from Defendants if they wanted to "stay longer or leave early" from a shift; and (5) "track all tasks they performed while in Defendants' clients' homes" and submit "daily progress reports indicating the specific services they provided." (ECF No. 74-3 ¶¶ 35–44.)

The agreements restricted Plaintiffs' autonomy vis-à-vis other job opportunities. One agreement "made clear that as an 'employee' of Defendants, Plaintiffs and other home care aides were not authorized to accept any additional employment directly offered by Defendants' clients." (ECF No. 74-3 ¶ 40.) Plaintiffs were purportedly barred from entering into "competitive employment" within 25 miles of any FinePoints office for the twelve months after their term of working for FinePoints. (*Id.* ¶43.) Furthermore,

> While employed with Defendants, Plaintiffs and other home care aides were strictly prohibited from soliciting referrals for any related employment opportunities from any referral source other than Defendants. The Confidentiality and Non-Competition Agreement made clear that violation of this condition would result in termination of the employment relationship and other repercussions. Consequently, Plaintiffs and other home care aides depended entirely on Defendants for their income for the duration of their employment.

(*Id.* ¶ 44.)

### B. *Wage-and-Hour Allegations*

"Until approximately mid-October 2022, Defendants promised to pay Plaintiffs" a wage of $25 per hour; this rate was reflected on pay stubs. (ECF No. 74-3 at 48.) "However, Defendants unlawfully withheld twenty (20) percent of the recorded hourly wages of Plaintiffs and other home care aides." (*Id.*) Thus, from January 2021 until October 2021, they received only $20 per hour

in bi-weekly payments. (*Id.* ¶ 49.) In "approximately October 2022," Defendants decreased

Plaintiffs' wages to $17 per hour. (*Id.* ¶ 50.)

> Plaintiffs make the following allegations about their schedules:

> 51. Defendants controlled the clients that Plaintiffs and other home care aides were assigned.

> 52. Defendants controlled Plaintiffs and other home care aides' work schedules. Once home care aides were assigned a client, Defendants were responsible for making the schedule particular to that client. Defendants required that Plaintiffs and other home care aides follow the schedules dictated by Defendants.

> 53. Defendants often scheduled Plaintiffs and other home care aides to provide care to multiple clients. It was routine for Defendants to schedule Plaintiffs and other home care aides to work back-to-back shifts at the homes of various clients during a single workday. This required Plaintiffs and others similarly situated to travel directly from one client's home to the next throughout their day.

> 54. Because Defendants' clients resided at various locations throughout Maryland, Plaintiffs and other home care aides often spent a significant amount of time each day traveling from one client's home to the next.

> 55. Plaintiffs often spent one (1) to ten (10) hours a week traveling between Defendants' clients' homes.

(ECF No. 74-3 ¶¶ 51–55.) Despite the fact that Plaintiffs regularly spent time traveling between

job sites during the work day, Defendants did not pay Plaintiffs for this time, and instead paid them

only for time they spent at clients' homes. (*Id.* ¶¶ 56–57.) "Additionally, Defendants required

Plaintiffs and other home care aides to record their work hours to reflect only the times they were

scheduled to work, not the amount of time they actually worked." (*Id.* ¶ 58.)

Plaintiff Bobb "consistently" worked over forty hours per week, and "regularly" worked

up to fifty-five hours in a week. (*Id.* ¶ 60.) For example, during a two-week period in March and

April 2022, she worked "89.97" hours, not including travel time. (*Id.* ¶ 62.) Plaintiff Bracey

"regularly" worked up to seventy-seven hours per week. (*Id.* ¶ 63.) During one two-week period

in October and November 2022, she worked "102.2 hours," not including travel time.

Even though Plaintiffs "routinely" worked over forty hours per week, "Defendants did not pay Plaintiffs and other home care aides 'time-and-a-half' their regular rates of pay" when they "recorded and worked" over forty hours in a week. (*Id.* ¶ 66.) Instead, Plaintiffs "received the same 'straight time' hourly rate for the hours they were scheduled to work in a client's home, regardless [of] if they were scheduled to work over forty (40) hours a week." (*Id.*) Furthermore, "Defendants paid Plaintiffs and other home care aides nothing for overtime hours deriving from compensable work time spent traveling between Defendants' clients' homes." (*Id.*)

"Defendants knew that Plaintiffs and other home care aides frequently worked over forty (40) hours per week" and that Plaintiffs "spent a significant amount of compensable time on many workdays traveling from one client's home to the next." (*Id.* ¶¶ 69–70.) Nevertheless, "Defendants refused to pay Plaintiffs and other home care aides for the wages they rightfully earned." (*Id.* ¶ 71.) They also "willfully misclassified Plaintiffs and other home care aides as independent contractors for purposes of withholding these wages." (*Id.* ¶ 73.)

In support of their default-judgment motion, Plaintiffs have provided additional evidence substantiating their allegations. These additional items of evidence, when relevant, will be discussed in the Court's analysis.

## III.    Legal Standard

After entry of default under Federal Rule of Civil Procedure 55(a), a party may move for default judgment. The Fourth Circuit has articulated a "strong policy that cases be decided on their merits." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993). But, "that policy is not without exceptions," and "default judgment is appropriate when the adversary process has been halted because of an essentially unresponsive party." *Dominion Fin. Servs., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 740 (D. Md. 2023) (cleaned up).

7

Entry of default against a defendant does not entitle a plaintiff to judgment as of right:

> "The defendant, by [its] default, admits the plaintiff's well-pleaded allegations of fact . . . [but] is not held . . . to admit conclusions of law. In short, . . . a default is not treated as an absolute confession by the defendant of [its] liability and of the plaintiff's right to recover." The court must . . . determine whether the [conceded facts] support the relief sought in [the] action.

*Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). "In the Fourth Circuit, district courts analyzing default judgments have applied the standards articulated by the United States Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to determine whether allegations within the complaint are 'well-pleaded.'" *Vasquez-Padilla v. Medco Props., LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017) (collecting cases).

While a plaintiff's factual allegations are deemed admitted, allegations relating to the amount of damages are not deemed admitted based on a defendant's failure to respond to a suit. *Meade Communities, LLC v. Whitaker*, Civ. No. ELH-22-2381, 2023 WL 2914787, at *2 (D. Md. Apr. 11, 2023). Instead:

> [T]he Court must make an independent determination regarding allegations as to damages. In so doing, the court may conduct an evidentiary hearing. However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages.

*Id.* at *3 (citations omitted).

## IV.    Analysis

### A. *Legal Framework under Federal and State Wage and Hour Laws*

The FLSA establishes a forty-hour workweek and requires employers to pay covered employees overtime wages equivalent to one-and-a-half times the employee's regular salary for all time in any week worked beyond that point. 29 U.S.C § 207(a)(1); *see also id.* § 216(b)

8

(providing employees with a private right of action for violations of § 207(a). To prevail on a claim of unpaid overtime wages under the FLSA, a plaintiff must show (1) that she was employed by the defendant, (2) that she worked more than forty hours in at least a single workweek, (3) without receiving overtime pay of one-and-a-half times her regular salary, and (4) that the defendant had knowledge (actual or constructive) of the overtime work. *See Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986); *Altes v. Pride Ctr. of Md., Inc.*, 693 F. Supp. 3d 511, 519, *vacated on other grounds*, 705 F. Supp. 3d 503 (D. Md. 2023); 29 U.S.C § 207(a)(1). The requirements for an overtime claim under the MWHL, "essentially the state parallel of the FLSA," are the same. *Gonzalez Cabrera v. Vargas Servs., LLC*, Civ. No. GLR-24-3200, 2025 WL 1569957, at *3 (D. Md. June 3, 2025); *Altes*, 693 F. Supp. 3d at 519; *see* Md. Code Ann., Lab & Empl. §§ 3-415(a), 3-420(a). Under both federal and Maryland law, time spent by an employee traveling between one worksite to another during the workday must be counted as hours worked. 29 C.F.R. § 785.38; Md. Code Regs. 09.12.41.10.

An employee can also bring an "overtime gap" claim under the FLSA, when an employer fails to pay an employee who works overtime all the "straight time" (*i.e.*, non-overtime) wages she is due. *Conner v. Cleveland Cnty.*, 22 F.4th 412, 426 (4th Cir. 2022). An overtime-gap claim is premised on the theory that "overtime 'cannot be said to have been paid . . . unless all the straight time' is paid" first. *Id.* (alteration in original) (quoting 29 C.F.R. § 778.315).[2] To bring an overtime gap claim, the plaintiff must show "that: (1) the employee worked overtime in at least one week; and (2) the employee was not paid all straight-time wages due under the employment agreement or applicable statute." *Id.*

The MWPCL, meanwhile, "requires an employer to pay its employees regularly while

---

[2] A "pure gap time claim," *i.e.*, a claim for an employee's unpaid straight-time wages in a week where they did not work any overtime, is not cognizable under the FLSA. *Conner*, 22 F.4th at 421.

employed, and in full at the termination of employment." *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625 (Md. 2014) (citing Md. Code Ann., Lab & Empl. §§ 3-502, 3-505). It permits employees to recover for unpaid straight time as well as overtime. *Altes*, 693 F. Supp. 3d at 518 (citing Md. Code Ann., Lab. & Empl. §§ 3-505, 3-507.2). "Read together" with the MWHL, the statutes "allow employees to recover unlawfully withheld wages from their employer, and provide an employee with two avenues to do so." *Peters*, 97 A.3d at 625.

To determine whether a plaintiff was "employed" by the defendant or was instead an independent contractor, courts apply the "economic reality" or "economic realities" test.[3] Under this test, courts consider:

> (1) The degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 241 (4th Cir. 2016) (alteration accepted). The same test applies to the question of whether someone is "employed" for purposes of the MWHL and MWPCL. *See id.* at 240; *McFeeley v. Jackson Street Entertainment, LLC*, 47 F. Supp. 3d 260, 267 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016).

This is a "flexible" test that considers the "totality of circumstances presented" and in which no single factor is dispositive. *McFeeley*, 825 F.3d at 241 (citation omitted). The "touchstone" of the test "is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself.'" *Id.* (alteration accepted) (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006).

---

[3] Somewhat confusingly, there are actually three different flavors of the economic reality test, each keyed to a slightly different inquiry. *See Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008). Relevant here is the test used "to distinguish between independent contractors and employees." *Id.*

**B.** *Liability*

Applying Plaintiffs' allegations—accepted as true—to the legal framework just articulated, the Court has little difficulty concluding that Plaintiffs are entitled to relief against FinePoints under the FLSA, MWHL, and MWPCL.

Turning to the first element of an overtime claim, the Amended Complaint establishes that Plaintiffs were employed by FinePoints. At least five of the six of the *McFeeley* factors counsel in favor of finding an employment relationship. First, FinePoints exercised substantial control over Plaintiffs' work by, *inter alia*, providing detailed individual-client treatment plans, setting Plaintiffs' work schedule, mandating the wearing of a FinePoints uniform, and requiring Plaintiffs to log their activities on a daily basis. Second, Plaintiffs had little opportunity for profit or loss based on their own skill; instead, they were generally required to abide by pre-set treatment plans, needed approval even just to extend the length of a client visit, and were expressly forbidden from soliciting business from clients. Third, the Amended Complaint does not suggest that Plaintiffs were expected to make any significant investment of equipment or materials, and the record indicates that FinePoints provided them with the minimal supplies that they needed, such as gloves. (ECF No. 112-2 at 10, 34 (Keller-Bee Dep. at 106, 293).) The fourth factor is neutral and does not strongly influence the Court's decision.[4] Fifth, although the Amended Complaint states that there was "high turnover" and that Plaintiffs often quit "after short periods," (ECF No. 74-3 ¶ 59), they "did not work in the temporary, project-related capacity typically associated with independent contracting." *Acosta v. At Home Pers. Care Servs. LLC*, Civ. No. 1:18-549 (LMB/IDD), 2019 WL

---

[4] Providing personal care is doubtless difficult and demanding work, but courts have recognized that home care aides are "(in traditional terms) low-skilled workers," *see Acosta v. At Home Pers. Care Servs. LLC*, Civ. No. 1:18-549 (LMB/IDD), 2019 WL 1601997, at *8 (E.D. Va. Apr. 15, 2019); *Options for Senior Am. Corp. v. United States*, 11 F. Supp. 2d 666, 667 (D. Md. 1998). However, the record indicates that many (perhaps all) of the Plaintiffs were certified nursing assistants ("CNAs"), and thus must have attained a not-insignificant degree of skill and training. (*See* ECF No. 112-2 at 8 (Keller-Bee Dep. at 91).)

11

1601997, at *8 (E.D. Va. Apr. 15, 2019). Finally, Plaintiffs' work was integral to FinePoints business; indeed, the provision of home care is apparently the very essence of FinePoints' business. Without Plaintiffs' work, it does not seem that FinePoints would have reason to operate whatsoever. In short, Plaintiffs were not in business for themselves but instead were employees of FinePoints—regardless of what label FinePoints used to describe them.

The remaining three elements of Plaintiffs' overtime claim are straightforward. Plaintiffs allege that they regularly worked over forty hours without receiving time-and-a-half pay, and they point in the Amended Complaint to two specific pay periods during which this happened. Furthermore, the Court can infer Defendants' knowledge that Plaintiffs were working overtime by (1) the fact that Defendants set Plaintiffs' work schedules and required Plaintiffs to log their activities daily, and (2) the very fact that FinePoints sent out paychecks to Plaintiffs reflecting that they worked more than eighty hours over two weeks. This is enough to establish the latter three elements of an overtime claim under the FLSA and MWHL.

The Amended Complaint also establishes that FinePoints is liable to Plaintiffs for uncompensated travel time from one work site to another. Liability flows from the FLSA under either a regular overtime claim or an overtime gap claim to the extent that Plaintiffs were not paid for travel time during weeks which they worked overtime. *See Conner*, 22 F.4th at 426. And even for weeks when Plaintiffs did not work overtime, they are still entitled to straight-time wage recovery for travel time pursuant to the MWPCL. *See Altes*, 693 F. Supp. 3d at 518.

Finally, FinePoints' across-the-board twenty percent deduction in employees' wages was violative of the MWPCL. Under that law, "[a]n employer may not make a deduction from the wage of an employee" unless the deduction falls into one of four specified categories, none of

12

which are applicable here.[5] Md. Code Ann., Lab. & Empl. § 3–503. Instead, FinePoints took the deduction simply because "that was the only way FinePoints would make—could make their money . . . ." (ECF No. 112-2 at 18 (Keller-Bee Dep. at 162).) As the Supreme Court of Maryland has explained:

> When an employer makes an unauthorized deduction under [Md. Code Ann., Lab. & Empl.] § 3–503, it is not paying all the compensation that is due to the employee. It is paying some part of that compensation (or perhaps all of it), unlawfully, to someone else. A violation of § 3–503 necessarily constitutes a violation also of § 3–502 or § 3–505.

*Marshall v. Safeway Inc.*, 88 A.3d 735, 745 (Md. 2014).

For these reasons, the Court concludes that FinePoints is liable to Plaintiffs for Counts I, II, and III of the Amended Complaint.

## C. *Actual Damages*

To recover damages under the FLSA, the employee "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). Recognizing that employees typically do not keep detailed records of their hours worked and that employer's records may be inadequate or inaccurate, courts do not impose an exacting proof requirement on FLSA plaintiffs. Instead:

> An employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.*; *accord Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016). The *Mount Clement*

---

[5] These are: that the deduction is either "(1) ordered by a court of competent jurisdiction"; "(2) authorized expressly in writing by the employee"; "(3) authorized by the Commissioner of Labor and Industry"; or "(4) otherwise made in accordance with any law or any rule or regulation issued by a governmental unit."

damages framework applies to claims brought under the MWHL and MWPCL as well. *See Lopez v. Lawns 'R' Us*, Civ. No. DKC-07-2979, 2008 WL 2227353, at *3 n.5 (D. Md. May 23, 2008); *Butler v. PP&G, Inc.*, No. JRR-20-3084, 2023 WL 3580374, at *4 (May 22, 2023), *report and recommendation adopted in relevant part*, 2023 WL 12090213 (D. Md. June 25, 2023).

When—as here—an employer's records are inadequate, plaintiffs may rely on estimates from statistical analyses and extrapolations from representative samples. *See Tyson Foods*, 577 U.S. at 456–57, 459; *see also Childress v. Ozark Delivery of Mo. LLC*, Civ. No. 6:09-03133-MDH, 2014 WL 7181038, at *2 (W.D. Mo. Dec. 16, 2014) ("[C]ourts uphold the use of extrapolated data in FLSA collective actions where the employer fails to adequately maintain records and where a reasonable inference exists between the underlying data and the derived data." (internal quotation marks and citation omitted)).

Plaintiffs cannot obtain a double recovery when the same conduct gives rise to liability under both federal and state labor laws. *See Mata v. G.O. Contractors Grp.*, No. TDC-14-3287, 2015 WL 6674650, at *4 (D. Md. Oct. 29, 2015); *Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018). So "the Court will award damages under the MWPCL as that statute provides the avenue for greatest recovery." *Mata*, 2015 WL 6674650, at *4; *cf. Rana*, 887 F.3d at 123 (vacating judgment awarding double recovery and remanding for district court to award judgment under state labor law that would provide for larger recovery).

As noted *supra* Part III, the Court does not take Plaintiffs' allegations at face value when it comes to damages. Here, Plaintiffs' evidence includes affidavits from two Plaintiff employees of FinePoints (ECF No. 20-2, 112-3), portions of the deposition testimony of Ms. Keller-Bee (ECF No. 112-2), and a report by Plaintiffs' putative expert, Dr. Liesl Mae Fox (ECF No. 112-4). The evidence shows that Plaintiffs are entitled to damages.

14

FinePoints failed to keep adequate records. (*See generally* ECF Nos. 72 (court order requiring FinePoints to produce employment records), 73 (affidavit of Ms. Keller-Bee attesting that Finepoints had no responsive documents).) Plaintiffs were able to obtain some records from FinePoints' third-party payment processors, but only for thirteen of the sixteen Plaintiffs and only for dates on or after December 7, 2021. (ECF No. 112-2 at 19.) And even the records that Plaintiffs were able to recover are not fully accurate, both because FinePoints sometimes "adjusted" hours downwards if employees ended up working for longer than they were originally scheduled, (*see* ECF No. 112-2 at 21–24 (Keller-Bee Dep. at 188–92)), and because the records did not account for any time spent traveling between worksites, (*see id.* at 26–27 (Keller-Bee Dep. at 198–99)).

Because FinePoints' records are lacking, Plaintiffs are entitled to rely on their affidavits and the report of Dr. Fox, a statistician who regularly testifies and provides analysis in employment cases.[6] (*See* ECF No. 112-4 at 20–22.) To estimate uncompensated time, she relied on employees' own estimates of their hours worked, as well as the limited time records produced by FinePoints and third-party payment processors. By comparing estimates of hours worked by eight Plaintiffs against the time records that FinePoints kept, Dr. Fox found that FinePoints only recorded and paid for seventy percent of hours worked on average (not including travel time, which was also uncompensated). (ECF No. 112-4 at 12–13.) This is an acceptable means of estimating uncompensated hours worked under the circumstances. *See Childress*, 2014 WL 7181038, at \*2 (rejecting a challenge under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to a report from Dr. Fox using similar methodology).

Dr. Fox divided the unpaid wages into four categories—(1) earnings withheld pursuant to FinePoints' across-the-board twenty percent wage deduction; (2) unpaid premiums for recorded

---

[6] Indeed, in *Tyson Foods* the Supreme Court expressly found analysis from Dr. Fox herself to be a "permissible means" of calculating unpaid wages. 577 U.S. at 455.

overtime hours; (3) unpaid straight-time wages for travel time; and (4) unpaid overtime wages for travel time. (*See* ECF No. 112-4 at 15–18.) Dr. Fox has provided a table estimating the amount of wages due under Maryland law including estimated unrecorded hours worked, (ECF No. 112-4 at 16); the Court will use this table to fix the amount of damages awarded.

### D. *Enhanced Damages*

The MWPCL gives a court discretion to award up to treble damages for unpaid overtime and straight-time wages if it finds that the employer did not withhold these wages "as a result of a bona fide dispute." Md. Code Ann., Lab. & Empl. § 3-507; *see Peters, Inc.*, 97 A.3d at 626, 629. Alternatively, the Court may award "liquidated damages," up to double actual damages, under the MWHL or under the FLSA. 29 U.S.C. § 216(b); Md. Code. Ann., Lab. & Empl. § 3-427(d)(1)(ii). The Court can award liquidated damages or treble damages, but not both. *Aguilar v. David E. Harvey Builders, Inc.*, Civ. No. GLS-18-03953, 2023 WL 7166312, at *24 (D. Md. Oct. 31, 2023). Courts in this District have granted double damages under the MWPCL upon a finding of no bona fide dispute, but have insisted on a showing of consequential damages before awarding treble damages. *See, e.g., id.*; *Morris v. King Oak Enters., Inc.*, Civ. No. 24-00782-AAQ, 2024 WL 4476303, at *9 (D. Md. Oct. 11, 2024); *Guzman v. Mahjoub*, Civ. No. 17-01591-PX, 2019 WL 2233351, at *4 (D. Md. May 23, 2019).

A bona fide dispute exists when "the employer has a good faith basis for refusing an employee's claim for unpaid wages." *Peters*, 97 A.3d at 627. The Court looks to whether the employer had an "actual, subjective belief that the party's position is objectively and reasonably justified." *Id.* (citation omitted). It is the employer's burden to show the existence of a bona fide dispute. *Id.* at 627–28.

Here, the record does not establish that FinePoints withheld wages as part of a bona fide

dispute. Instead, the record indicates that FinePoints attempted to classify its workers as independent contractors, and deny them overtime and travel pay, because it was financially expedient to do so. (*See, e.g.,* ECF No. 112-2 at 25 (Keller-Bee Dep. at 193 ("[W]e didn't offer overtime because we couldn't offer overtime, and they knew that.")); *id.* at 31 (Keller-Bee Dep. at 232 (stating that she decided not to pay employees for travel time because "[w]e couldn't afford to")).) Moreover, Ms. Keller-Bee testified to being unaware of hourly wage, overtime, and travel-time wage laws, (*id.* at 33 (Keller-Bee Dep. at 280)), in dereliction of FinePoints' "obligation to remain informed" about labor and employment law, *Pinnacle Grp., LLC v. Kelly,* 178 A.3d 581, 600 (Md. Ct. Spec. App. 2018). An employer's choice to withhold wages while remaining ignorant of the law is incompatible with a finding of good faith or a bona fide dispute. *See id.*

Under these circumstances, the Court finds enhanced damages appropriate. Plaintiffs, although maintaining that they need not show consequential damages to be entitled to treble damage, nevertheless show that at least two Plaintiffs suffered serious financial harms because of their low wages. Bobb testifies that she "fell behind on [her] car payments and [her] car was repossessed as a result." (ECF No. 112-5 at 3.) Another Plaintiff, Bracey, testifies that it was "difficult to pay for basic necessities" and that she "recently filed for Chapter 7 bankruptcy." (ECF No. 112-3 at 7.) These Plaintiffs are entitled to treble damages. *See Avila v. Marlin Lighting LLC,* Civ. No. 22-49, 2022 WL 17094583, at *5 (D. Md. Nov. 21, 2022) (awarding treble damages under the MWPCL when plaintiffs were unable to pay bills on time and suffered late fees, bills, utility disconnections, and stress).

There is no evidence that the other Plaintiffs suffered consequential damages. The Court will assume that, in an appropriate case, it could award treble damages even without such a showing (for instance, in the case of particularly malicious or egregious underpayment), but there

17

are no considerations that make this case sufficiently severe to warrant treble damages in the absence of a showing of consequential damages. So, for the rest of the Plaintiffs, the Court will simply award double damages under the MWPCL.

### E. *Attorneys' Fees and Costs*

Plaintiffs request $129,055.60 in attorneys' fees. (ECF No. 112-1 at 32.)

Plaintiffs are entitled to attorney's fees and costs under both the FLSA and Maryland state law. *See* 29 U.S.C. § 216(b); Md. Code Ann., Lab. & Empl. §§ 3–427(a)(3) (MWHL); 3–507.2(b) (MWPCL). This award is "mandatory," although the amount of fees and costs allowed is within the Court's discretion. *Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984).

In FLSA actions, the Court may determine the amount of fees using the lodestar method. *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 988 (4th Cir. 1992). Under this method:

> First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 27 F.4th 291, 303 (4th Cir. 2022) (quoting *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013)). The *Johnson* factors, in turn, include:

> (1) the time and labor expended by counsel; (2) the novelty and difficulty of the questions presented; (3) the skill required to properly perform the legal services rendered; (4) the lawyer's opportunity costs in pressing the instant litigation; (5) the customary fee for similar work; (6) the lawyer's expectations at the outset of the litigation; (7) any time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the lawyer; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the lawyer and the client; and

(12) attorney's fees awards in similar cases.

*Id.* at 303 n.7.

In finding the lodestar amount, the Court may consider the fee matrix set forth in Appendix B to the District of Maryland's Local Rules as a "useful starting point," but it does not treat rates within the matrix range as "presumptively reasonable." *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753–54 (4th Cir. 2025) (citations omitted).

Here, the fee requests are supported by affidavits from counsel from the two firms—in this instance, both nonprofit entities—that represented Plaintiffs, along with a detailed spreadsheet itemizing all legal tasks performed and billed. (*See* ECF Nos. 112-6, 112-8, 112-9.) The Court notes that the rates requested by Plaintiffs—from $150 per hour for a paralegal to $200 per hour for the juniormost lawyer to $425 per hour for the seniormost lawyer—fall within the Appendix B guidelines range. *Compare* (ECF No. 112-6 at 3; ECF No. 112-8 at 2–4) *with* Local Rules Appendix B.3 (D. Md. 2025). The rates are commensurate with rates approved by this Court in other FLSA actions in recent years. *See, e.g., Prasch v. Bottoms Up Gentlemen's Club, LLC*, Civ. No. 23-00634-LKG, 2024 WL 2977885, at *11 (D. Md. June 13, 2024); *Luna v. Yummy, LLC*, No. 8:23-01784-AAQ, 2024 WL 3554969, at *5 (D. Md. July 26, 2024). Counsel have also forgone billing for certain compensable activities (for example, waiving time for attorneys and staff who billed fewer than ten hours and billing for only one attorney even when multiple attorneys attended a meeting), and have applied a five percent across-the-board reduction in hours billed. (*See* ECF No. 112-6 at 6–7; ECF No. 112-8 at 5.)

After considering the fee application in light of the *Johnson* factors and the criteria set forth in *Lumber Liquidators*, the Court is satisfied that the requested attorneys' fees are reasonable and appropriate. It is true that the total amount of time billed in this case—just under 409 hours—is

on the high end for what the Court typically approves in default judgment settings, and neither the legal nor factual issues presented were novel or unusually complex. But, unlike in many cases where default judgment is sought, here the parties engaged in extensive motions practice and discovery before the default was entered. Further, discovery was complicated by FinePoints' failure to comply with discovery deadlines and orders, which necessitated the filing of two successful motions to compel. (*See* ECF Nos. 58, 72.) Finally, Plaintiffs have achieved substantial success on the merits of their claims against FinePoints.[7]

Plaintiffs also request costs in the amount of $14,513.84. (ECF No. 112-1 at 32–33.) These are appropriate and will be awarded.

### F. *Service Award*

Plaintiffs request service awards of $5,000 each for Plaintiffs Bobb and Bracey. (ECF No. 112-2 at 29.)

A collective action under the FLSA differs from a class action under Federal Rule of Civil Procedure 23 in that, "unlike in a class action . . ., in a collective action under the FLSA, a named plaintiff represents only himself until a similarly-situated employee opts in" to the lawsuit. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 758 (4th Cir. 2011). "Because there is no 'representative plaintiff' in FLSA collective actions, generally no incentive payment to a named plaintiff in an FLSA collective action is warranted." *Leigh v. Bottling Grp., LLC*, Civ. No. DKC-10-0218, 2012 WL 460468, at *7 (D. Md. Feb. 10, 2012) (quoting *Heath v. Hard Rock Café Int'l (STP), Inc.*, Civ. No. 6:10–344–ORL–28KRS, 2011 WL 5877506, at *5 (M.D. Fla. Oct.28, 2011)).

Although some courts in this Circuit have approved settlement agreements providing for service awards for FLSA lead plaintiffs in collective actions, *see, e.g., Leigh*, 2012 WL 460468, at

---

[7] In this case there is no need to deduct any fees for activities spent on unsuccessful claims.

20

*7, *Stone v. SRA Int'l, Inc.*, Civ. No. 2:14-209, 2015 WL 12748271, at *4 (E.D. Va. Mar. 20, 2015);

*Edelen v. Am. Residential Servs., LLC*, Civ. No. DKC-11-2744, 2013 WL 3816986, at *16 (D. Md.

July 22, 2013), the Court is not aware of authority providing for the Court to order such an award

in an FLSA collective action in the absence of a settlement agreement. For that reason, the request

for a service award will be denied.

## V.    Rule 54(b) Determination

The final issue to address is whether entry of final judgment as to FinePoints is appropriate

at this time, given the existence of remaining claims against Ms. Keller-Bee.

The leading case on the propriety of entering final default judgment while claims against

other defendants remain outstanding is *Frow v. De La Vega*, 82 U.S. 552 (1872). There, the Court

decried the "unseemly and absurd" possibility that a final judgment could be entered against one

defendant, while the case proceeded to the merits against the non-defaulting defendant and an

inconsistent judgment be obtained. *Id.* at 554. In such cases, the Court held, the proper method

when one defendant defaults "is simply to enter a default . . ., and proceed with the cause upon the

answers of the other defendants," and abstain from entering a "final decree" until the conclusion

of the case against all defendants. *Id.* The Fourth Circuit has read *Frow* to extend to cases in

which "liability is joint and/or several" or merely "closely interrelated." *United States for Use of

Hudson v. Peerless Ins. Co.*, 374 F.2d 942, 944–45 (4th Cir. 1967) (citation omitted).

Under *Frow* and *Hudson*, "where multiple defendants are jointly and/or severally liable for

[a plaintiff's] alleged damages, or are otherwise similarly situated, courts should refrain from

issuing a default judgment until the answering defendant addresses the merits of the plaintiff's

claims." *Leighton v. Homesite Ins. Co. of the Midwest*, 580 F. Supp. 3d 330, 333 (E.D. Va. 2022);

*see also Grim v. Balt. Police Dep't*, Civ. No. ELH-18-3864, 2019 WL 5865561, at *30 (D. Md.

Nov. 8, 2019).

The rule against entering final judgment against a defaulting judgment when outstanding claims or parties remain in the case is not absolute. A court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). To make this determination, the Court must first decide whether the judgment is "final in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993) (internal quotation marks omitted) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–8 (1980)).[8]

Next, the Court considers the following factors to decide whether there is no just reason for delay:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Kinsale Ins. Co. v. JDBC Holdings, Inc.*, 31 F.4th 870, 874 (4th Cir. 2022) (quoting *Braswell*, 2 F.3d at 1335–36). The inquiry is "tilted from the start against the fragmentation of appeals"; as such, Rule 54(b) certification is the "exception rather than the norm." *Id.* at 874, 876 (cleaned up).

This is the rare case where Rule 54(b) certification is appropriate.

Here, the first, second, and third *Braswell* factors are all intertwined. Plaintiffs are pressing their claims against Ms. Keller-Bee in the bankruptcy proceeding, and, although they are factually

---

[8] Here, judgment against FinePoints is "final" in that all of Plaintiffs' claims against FinePoints will be definitively resolved.

and legally overlapping with the claims at issue in this opinion, it is very likely that they will be

resolved in bankruptcy court without need for review from this Court. As Plaintiffs explain:

> It is unlikely that the need for this Court's review of the judgment against
> FinePoints will be mooted by future developments in the District Court, or that the
> Court will be obliged to consider the issue a second time, because it is unlikely that
> this Court will be called upon to enter judgment either for or against Ms. Keller-
> Bee. If Plaintiffs are successful in bankruptcy court, their claims will be resolved
> without the need to seek judgment from this Court. If Plaintiffs are unsuccessful in
> bankruptcy court, their ability to obtain relief will be foreclosed as the debt will be
> discharged, and Plaintiffs will risk significant penalties if they continue seeking to
> recover their debts from Ms. Keller-Bee. *See Taggart v. Lorenzen*, 587 U.S. 554,
> 565 (2019) (setting the standard for when a bankruptcy court may hold a creditor
> in civil contempt for violating a discharge order). While maintaining the pending
> litigation in this Court against Ms. Keller-Bee is necessary to preserve Plaintiffs'
> claims in the unlikely event that Ms. Keller-Bee were to dismiss her bankruptcy
> petition, the changes of this happening are de minimis, and thus, there is a strong
> likelihood that this Court will not be called on to risk inconsistent judgments.

(ECF No. 112-2 at 27.)

The Court finds this explanation credible and persuasive. It is possible that the Court will

be called upon to revisit the issues it adjudicates today, but that is unlikely. Thus, while the concern

about piecemeal appeals and inconsistent judgments is not entirely absent, it is not nearly as strong

as it is when the court issues a Rule 54(b) certification as to one issue while the parties are still

actively litigating other issues. *See Kinsale*, 31 F.4th at 877 (holding that the district court abused

its discretion in issuing a partial final judgment when the very same parties were set to go to trial

as to other issues).

There are no counterclaims which would result in a set-off against the judgment, so that,

too, weighs in favor of a Rule 54(b) certification.

Finally, the Court considers the "miscellaneous factors," of which the most important

consideration here is the reality that FinePoints may be close to insolvency if not defunct. (*See*

ECF No. 108 (correspondence from Ms. Keller-Bee representing that FinePoints "is non-existent

and no longer in business to provide services").) "Courts have frequently found no just reason for delay, and entered a Rule 54(b) judgment, when the judgment debtor is insolvent or may become insolvent before the conclusion of judicial proceedings." *Pereira v. Cogan*, 275 B.R. 472, 474 (S.D.N.Y. 2002) (collecting cases), *aff'd*, 52 Fed. App'x 536 (2d Cir. 2002); *accord CapitalSource Fin., LLC v. Delco Oil, Inc.*, Civ. No. DKC-06-2706, 2010 WL 3733934, at *6 (D. Md. Sept. 20, 2010). In such instances, a plaintiff's practical ability to recover on a judgment may be severely compromised—if not outright destroyed—if she has to wait to collect until all claims in the case have been adjudicated. *Cf. Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 16 (2d Cir. 1997) (holding that there may be no just reason for delay "where a plaintiff might be prejudiced by a delay in recovering a monetary award" (citing *Curtiss-Wright*, 446 U.S. at 11–12)). Here, the Court has no way of knowing how long it will take for Ms. Keller-Bee's bankruptcy case to resolve, and there is a real risk that FinePoints' assets (to the extent there still are any) will be long gone by the time that it is ready to enter final judgment on Plaintiffs' claims against her.

For these reasons, the Court finds no just reason for delay of entry of final judgment against FinePoints. *See CapitalSource*, 2010 WL 3733934, at *6 (issuing a Rule 54(b) certification of final judgment against certain defendants where the liability of those defendants was "fully decided," where those defendants were or were likely soon to be insolvent, and where remaining claims against an outstanding defendant were stayed in light of that defendant's bankruptcy).

## VI.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Default Judgment and for Attorneys' Fees (ECF No. 112) will be granted. Final judgment will be entered in favor of Plaintiffs and against FinePoints on all counts of the Amended Complaint. The Court will award $155,264.86 in actual damages, and another $230,916.87 in enhanced damages, for a total of $386,181.73, in accordance

with the following chart:

| Plaintiff | Actual Damages | Enhanced Damages |
|---|---|---|
| Margaret Bobb | $54,383.97 | $108,767.94 |
| Erica Crowder | $14,791.94 | $14,791.94 |
| Kesha Gordon-Brown | $96.34 | $96.34 |
| Tamara Johnson | $2,279.40 | $2,279.40 |
| Susanne Veney | $31,126.63 | $31,126.63 |
| Leeanna Rossman | $3,120.36 | $3,120.36 |
| Stephanie Clahar | $10,793.39 | $10,793.39 |
| Jessie Rodriguez | $37.80 | $37.80 |
| Melody Myers | $2,173.23 | $2,173.23 |
| Delisia Bracey | $21,268.04 | $42,536.08 |
| Juliana Richards | $534.48 | $534.48 |
| Theresa Reid | $8,230.44 | $8,230.44 |
| Melvina Bradley | $3,201.27 | $3,201.27 |
| Doreen Downs | $2,253.60 | $2,253.60 |
| Nia Green | $946.61 | $946.61 |
| Anifatu Hallowell | $27.36 | $27.36 |

The Court will also award $129,055.60 in attorneys' fees and $14,513.84 in costs. No service award will be ordered.

DATED this ___7___ day of August, 2025.

BY THE COURT:

James K. Bredar
United States District Judge

25